Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 4982 | DATE | FEB. 20, 2002 |
| CASE TITLE | HARTFORD FIRE INSURANCE COMPANY v. JEAN MAYNARD, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion to dismiss [3-1] is denied. Defendants shall answer the complaint within two weeks. All discovery, including any expert discovery, is to be completed by June 3, 2002. Status hearing set for March 20, 2002 at 11:00 a.m. at which the parties shall submit a discovery scheduling plan listing name, date, time, and place for all remaining depositions.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| ✓ | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | 2/21/02 date docketed | 14 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | AWR docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | |
| cw | courtroom deputy's initials | 02 FEB 20 PM 4:51 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARTFORD FIRE INSURANCE COMPANY )
OF ILLINOIS, )
 )
        Plaintiff, )
 )
   v. ) No. 01 C 4982
 )
JEAN MAYNARD, RICHARD BEDARD, )
CAROLINE BOIVIN, and )
2987988 CANADA INC., )
 )
        Defendants. )

DOCKETED
FEB 21 2002

## MEMORANDUM OPINION AND ORDER

According to the allegations of the complaint, plaintiff Hartford Fire Insurance Company of Illinois provided to Bell Sports Corporation ("Bell Corp.") and its subsidiary Bell Sports Canada, Inc. ("Bell Canada") insurance coverage for losses caused by acts of employee dishonesty. Defendants Jean Maynard (President), Richard Bedard (Director of Operations), and Caroline Boivin (Controller) were officers of SportRack Canada, Inc. ("SportRack Canada"), a Canadian corporation located in Granby, Quebec which manufactured automotive roof rack systems for bicycles, skis, kayaks, and other recreational equipment. Directly and/or through other entities, Maynard, Bedard, and

defendant 2987988 Canada Inc. ("2987988 Inc.") were shareholders of SportRack Canada.[1] Pursuant to a May 12, 1995 Asset Purchase Agreement (the "First APA"), Bell Canada acquired SportRack Canada which became the Bell SportRack Division ("Bell SportRack") of Bell Canada, with its operations remaining in Granby. Defendants remained as officers of Bell SportRack. Also, in accordance with § 9.13 of the First APA, Bedard entered into an employment agreement with Bell Canada (the "Bedard Employment Agreement") and Placement Jean Maynard Inc. ("Placement") entered into a consulting agreement with Bell Canada in which Placement agreed to provide Maynard's services as a consultant (the "Maynard Consulting Agreement"). Under the First APA, Maynard and Bedard were thereafter entitled to certain bonus payments[2] depending on the performance of Bell SportRack, with the Bonus provisions later being amended in April 1996 (the "1996 Amendment"). The Bonuses were to be computed annually based on a June 30 fiscal year. Bell Canada paid the 1996 and 1997 fiscal year Bonuses.

---

[1] Defendants represent that Maynard and Bedard were shareholders of 2987988 Inc. and further represent that 2987988 Inc. and an individual not named in the present lawsuit were the shareholders of SportRack Canada.

[2] The Complaint refers to Earn-Outs, Mondial Bonuses, and Excess Sales Bonuses, all of which are contained in Article 3 of the First APA. For present purposes, there is no need to distinguish the different types of bonus payments which will be jointly referred to as the "Bonuses."

Pursuant to a July 2, 1997 Asset Purchase Agreement (the "Second APA"), the assets of Bell SportRack were sold to Advance Accessory Systems Canada, L.L.C. ("AAS"). The Second APA provided that the fiscal year 1997 Bonuses were to be paid prior to the sale and AAS assumed Bell Canada's obligation to pay the Bonuses for fiscal year 1998 and thereafter. In July 1998, AAS informed Bell Canada that the Bonuses had been based on performance reports containing false and misrepresentative figures. The present lawsuit seeks damages related to the fiscal year 1996 and 1997 Bonuses. There is no claim for damages based on any fiscal year 1998 Bonuses that may have been due from AAS.

In the present lawsuit, it is alleged that defendants are responsible for the alleged misrepresentations. Bell Corp. subsequently filed a claim under Hartford's insurance policy. In January 2000, Bell Corp. and Hartford settled the insurance claim. Under the settlement, Bell Corp. assigned to Hartford all of its rights, claims, and causes of action against Maynard, Bedard, Boivin, and "all persons and entities acting on their behalf in connection with the events" contained in Bell Corp.'s insurance claim.

Hartford's complaint contains three counts. Count I is labeled as a fraud claim against the three individual defendants. Count II is labeled as a breach of contract claim against Maynard, Bedard, and 2987988 Inc. Count III is labeled as a

breach of fiduciary duty claim against the three individual defendants.

Presently pending is defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss. Defendants contend that Quebec law applies to the claims in this case and that Counts I and III are subject to dismissal because Quebec law would limit the claims in this case to the one contract claim. As to all three counts, defendants contend that any right to bring the claims belongs to AAS, which has not assigned those rights to Bell Canada, Bell Inc., or Hartford. It is also claimed that AAS has already settled any possible claims against defendants. Alternatively, it is contended that the Count I fraud claim has not been alleged with the specificity required by Fed. R. Civ. P. 9(b). Defendants' motion relies in part on documents and allegations that are not part of the complaint. The motion will not be converted to one for summary judgment. See Fed. R. Civ. P. 12(b) (last sentence).

On a Rule 12(b)(6) motion to dismiss, plaintiff's well-pleaded allegations of fact are taken as true and all reasonable inferences are drawn in plaintiff's favor. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000). A complaint need not set forth all relevant facts or recite the law; all that is required is a short and plain statement showing

that the party is entitled to relief. Fed. R. Civ. P. 8(a); Anderson v. Simon, 217 F.3d 472, 474 (7th Cir. 2000), cert. denied, 531 U.S. 1073 (2001); Scott v. City of Chicago, 195 F.3d 950, 951 (7th Cir. 1999); Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir. 1996). A plaintiff in a suit in federal court need not plead facts; conclusions may be pleaded as long as the defendant has at least minimal notice of the claim.[3] Fed. R. Civ. P. 8(a)(2); Scott, 195 F.3d at 951; Albiero v. City of Kankakee, 122 F.3d 417, 419 (7th Cir. 1997); Jackson v. Marion County, 66 F.3d 151, 153-54 (7th Cir. 1995). It is unnecessary to specifically identify the legal basis for a claim as long as the facts alleged would support relief. Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir. 2000); Scott, 195 F.3d at 951; Albiero, 122 F.3d at 419; Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992). It is also unnecessary to plead facts that would negate an affirmative defense. Alvarado v. Litscher, 267 F.3d 648, 651-52 (7th Cir. 2001); Tregenza v. Great American Communications Co., 12 F.3d 717, 718 (7th Cir. 1993), cert. denied, 511 U.S. 1085 (1994); Wade v. Henderson, 2002 WL 15697 *1 (N.D. Ill. Jan. 4, 2002).[4]

---

[3]As to the Count I fraud claim, however, the pleading requirement of Rule 9(b) must be satisfied.

[4]Accord and satisfaction is an affirmative defense. See Fed. R. Civ. P. 8(c); Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d
(continued...)

It is also true, however, that a plaintiff can plead himself or herself out of court by alleging facts showing there is no viable claim. Jackson, 66 F.3d at 153-54; Tregenza, 12 F.3d at 718; Early v. Bankers Life & Casualty Co., 959 F.2d 75, 79 (7th Cir. 1992). Moreover, attaching actual documents to the complaint will override inconsistent descriptions of those documents alleged in the body of the complaint. See In re Wade, 969 F.2d 241, 249 (7th Cir. 1992); Beam v. IPCO Corp., 838 F.2d 242, 244-45 (7th Cir. 1988). Additionally, there is a narrow exception that a document (particularly a contract) that has not been made part of the complaint but which has been provided by the moving party, can nevertheless be considered on a Rule 12(b)(6) motion if the document is referred to in the complaint and is central to a claim contained in the complaint. Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998); Wright v. Associated Insurance Cos., 29 F.3d 1244, 1248 (7th Cir. 1994). Further, as long as they are consistent with the allegations of the complaint, a plaintiff may assert additional facts in its response to a motion to dismiss. Brokaw v. Mercer County, 235 F.3d 1000, 1006 (7th Cir. 2000); Forseth, 199 F.3d at 368; Albiero, 122 F.3d at 419; Gutierrez v. Peters, 111 F.3d 1364, 1367 n.2 (7th Cir. 1997); Hrubec v. National Railroad

---

[4](...continued)
232, 234-35 & n.2 (7th Cir. 1991); United States v. Bretzlaff, 865 F. Supp. 515, 518 (C.D. Ill. 1994).

Passenger Corp., 981 F.2d 962, 963-64 (7th Cir. 1992). Additionally, on a motion to dismiss, a determination of the proper choice of law is limited to being made on the same facts as can otherwise be assumed true on a Rule 12(b)(6) motion, including additional consistent facts that the plaintiff concedes are true. See Calkins v. Dollarland, Inc., 117 F. Supp. 2d 421, 430 (D.N.J. 2000); First Wall Street Capital Corp. v. International Property Corp., 1998 WL 823619 *7 (S.D.N.Y. Nov. 25, 1998); Employers Mutual Casualty Co. v. Key Pharmaceuticals, Inc., 1992 WL 8712 *8, 9, 11 (S.D.N.Y. Jan. 16, 1992).

Defendants contend that, under the Second APA, any right to a refund of the 1996 and 1997 Bonuses was transferred to AAS and therefore the Bell entities could not have assigned to Hartford any right to sue based on those Bonuses. The Second APA is referred to in the Complaint, but is not attached to the Complaint. Although referenced, the Second APA is not central to any claim made by Hartford. Hartford's contract claim is based on the First APA. The fraud and fiduciary duty claims are also related to the First APA. Moreover, all the claims are based on conduct that occurred before the Second APA went into effect. Nevertheless, attached to defendants' motion to dismiss and relied upon regarding the assignment argument are the table of contents, six contract pages, and one schedule of the Second APA.

Hartford contends that the Second APA documents should not be considered because outside the Complaint. Alternatively, Hartford provides the complete 49 pages of the Second APA, see Pl. Answer Brief Exh. B,[5] and argues that the nonambiguous language of the Second APA did not transfer to AAS any right to the pending claims based on the 1996 and 1997 Bonuses.

Since the Second APA is not central to any claim Hartford makes, it may not be relied upon based on defendants attaching it to their motion to dismiss. However, it is referred to in the Complaint and Hartford has provided a copy of it in response to the motion to dismiss. Moreover, there is no dispute that Hartford has provided an accurate copy of the contract. Presently construing the Second APA may substantially aid the parties in resolving their dispute. Therefore, the court will consider the Second APA as regards the assignment of the claims presently in dispute. Since construction of the Second APA does not lead to the dismissal of any claim, it is unnecessary to formally convert the motion to one for summary judgment and permit Hartford to file any possible additional response.

The Second APA contains a New York choice of law provision and the parties agree, at least for purposes of the pending motion to dismiss, that New York law is therefore the

---

[5]Hartford does not provide the schedules or referenced contracts, which it represents are three inches thick.

appropriate law to apply in construing the Second APA. However, it is unnecessary to resort to any particular aspect or presumption of New York contract law; the assignment issue can be resolved simply by reading the plain language of the contract.

Defendants contend § 1.1 of the Second APA transferred to AAS all rights under the First APA, including all rights related to payment of the Bonuses. The First APA, 1996 Amendment, Bedard Employment Agreement, and Maynard Consulting Agreement are all specifically scheduled as Assigned Contracts. See Second APA, Schedule 1.1(a)(vii).[6] The paragraph following § 1.1(a)(xvii) of the Second APA defines "Purchased Assets" as the "assets, properties, interests in properties and rights described" in Second APA § 1.1(a). This includes the Assigned Contracts. See Second APA § 1.1(a)(vii). Defendants, however, fail to acknowledge express contract language that certain rights and obligations under the Assigned Contracts were not part of the Purchased Assets transferred to AAS.

Section 1.1(a) of the Second APA provides in part:

> 1.1. <u>Transfer of Assets</u>. (a) On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller shall sell, transfer, convey and assign to the Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances), and the Buyer shall purchase and acquire from the Seller, all of the

---

[6]A copy of this Schedule is contained in Exhibit E to defendants' motion to dismiss.

> Seller's right, title and interest in, to and under the assets, properties, interests in properties and rights of the Seller of every kind, nature and description, whether real, personal or mixed, movable or immovable, tangible or intangible, primarily used in or primarily held for use in the Business (<u>other than the Excluded Assets</u>), wherever located, as the same shall exist immediately prior to the Closing, including without limitation, the following:
> \* \* \*
> (vii) all contracts, agreements, licenses, personal property leases, commitments, purchase orders, sales orders and other agreements in each case, to the extent primarily related to the Business, all of which are listed on <u>Schedule 1.1(vii)</u> (collectively, the "Assigned Contracts"); . . . .

First APA § 1.1(a) (emphasis added).

Section 1.1(a) expressly states that it does not transfer, convey, or assign Excluded Assets. As a corollary, § 1.2 provides:

> 1.2. **Assets Not Being Transferred.** Anything contained in this Agreement to the contrary notwithstanding, there are expressly excluded from the Purchased Assets the following:
> \* \* \*
> (c) claims or rights against third parties relating to any Excluded Asset or Excluded Obligation;
> \* \* \*
> (i) all liabilities or obligations under any contracts, agreements, licenses, personal property leases, commitments, purchase orders, sales orders, and other agreements not effectively assigned under this Agreement or under any Related Document; . . . .

Second APA § 1.2.

The Definitions Table of the contract provides that § 1.2(i), quoted above, defines "Excluded Assets." Section 1.4 in its entirety is designated as defining "Excluded Obligations." Section 1.3(b) is designated as including the definition of "Excluded Earnout Liabilities."

Section 1.4 provides in part:

> 1.4. <u>Liabilities Not Being Assumed</u>. Anything contained in this Agreement to the contrary notwithstanding, the Buyer is not assuming any liabilities or obligations (fixed or contingent, known or unknown, matured or unmatured) of the Seller other than the Assumed Obligations, whether or not relating to the Purchased Assets or the Business, all of which liabilities and obligations shall at and after the Closing remain the exclusive responsibility of the Seller. Without limiting the generality of the foregoing, the Buyer is not assuming any of the following liabilities and obligations:
> \* \* \*
> (i) all Excluded Earnout Liabilities; . . . .

Second APA § 1.4(i).

Section 1.3(b), which defines Excluded Earnout Liabilities provides:

> 1.3. <u>Liabilities Being Assumed</u>. At the Closing, subject to the terms and conditions of this Agreement, simultaneously with the sale, transfer, conveyance and assignment to the Buyer of the Purchased Assets, the Buyer shall assume, pay and perform when due the following, and only the following liabilities and obligations of the Seller:
> \* \* \*
> (b) all liabilities and obligations arising after the Closing under the Assigned

> Contracts which are effectively assigned to the
> Buyer in accordance with their respective terms;
> <u>provided</u>, however, <u>that all liabilities and
> obligations under Article III and Section 2.2(vi)
> of the [First APA as amended][7] of the Seller to
> the extent arising out of or related to periods
> prior to and including the period ending on the
> date of the Closing Balance Sheet (the "Excluded
> Earnout Liabilities") shall not be assumed, paid
> or performed by the Buyer (it being understood
> that the Seller shall satisfy the Excluded
> Earnout Liabilities in full on or prior to the
> Closing)</u>; . . . .

Second APA § 1.3(b) (emphasis added).

Section 1.1(a) expressly provides that Excluded Assets were not part of the rights transferred to AAS as part of the Purchased Assets. Consistently, § 1.2(c) provides that claims or rights against third parties relating to an Excluded Asset or Excluded Obligation were not transferred and § 1.2(i) defines Excluded Assets as <u>inter alia</u> contractual liabilities or obligations that were not transferred. Excluded Earnout Liabilities are specifically designated as a type of Excluded Obligation (§ 1.4(i)) and would also fall under the definition of an Excluded Asset. The introductory paragraph of § 1.4 makes clear that Excluded Assets include "liabilities or obligations . . . <u>relating to the PurchaseD Assets</u>, all of which liabilities and obligations shall at and after the closing remain the

---

[7]Article 3 includes the obligations to pay the Bonuses at issue in the present case.

exclusive responsibility of the Seller," to the extent they are not "Assumed Obligations." As set forth in § 1.3(b), Excluded Earnout Liabilities includes the fiscal year 1996 and 1997 Bonuses and AAS did not assume those obligations and liabilities. Thus, the 1996 and 1997 Bonuses were not part of the Purchased Assets (or liabilities) transferred to AAS and Bell Canada therefore retained claims or rights against third parties related thereto. Section 1.1(a) did not transfer to AAS any rights or obligations related to the 1996 and 1997 Bonuses.

Even if the Second APA could properly be considered on defendants' motion to dismiss (or on a converted motion for summary judgment), the Second APA would not support that Hartford's assignor had previously transferred away the claims asserted in the present case.[8]

Defendants also contend that, under Quebec law, there can be no fraud and fiduciary duty claim that is distinct from the contract claim.[9] For prudential reasons, the court declines to

---

[8] The purported 1999 settlement between AAS and defendants is clearly a document that is not central to Hartford's claims. But even if that settlement were also to be considered, it would not affect today's ruling. Since claims for the return of the 1996 and 1997 bonuses were not transferred to AAS, any settlement between AAS and defendants could not have settled the claims contained in the present case.

[9] Defendants' exposition of Quebec law does not expressly address the question of whether a fraud and fiduciary duty claim could be brought against defendant Boivin, who was not a party to
(continued...)

resolve this issue on a motion to dismiss. First, as to the choice of law issue, Hartford's factual allegations must be taken as true and, in any event, the facts necessary to decide the choice of law issue are only marginally developed. But even assuming it were to be held that Quebec law applies, it is not clear that there are no set of facts consistent with the allegations of the complaint under which it would be clear that Quebec law excludes the possibility of the separate fraud and fiduciary duty claims. Third, even if the court were to rule in defendants' favor on this issue, it would not affect discovery in this case. Hartford would still be able to pursue the same allegations under the rubric of a contract claim. Perhaps the scope of recoverable damages would be more narrow, but that would be unlikely to affect the scope of discovery, especially considering that the fraud and fiduciary duty claims would still not be dismissed as to Boivin. For the foregoing reasons, the court will not resolve the choice of law issue or the related issue of the scope of noncontractual claims.

Still to be considered is the question of whether Count I satisfies the requirements of Fed. R. Civ. P. 9(b). Rule 9(b)

---

⁹(...continued)
the First APA and who is not named in the contract count. Hartford's Quebec law expert summarily states that the contract rule relied upon by defendants could not possibly apply to Boivin.

requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  The circumstances of fraud or mistake generally include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."  Slaney v. International Amateur Athletic Federation, 244 F.3d 580, 599 (7th Cir.), cert. denied, 122 S. Ct. 69 (2001); General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997).  A complaint must outline the alleged misrepresentations and reasonably notify a defendant of the specifics of the alleged fraudulent activity.  Lachmund v. ADM Investor Services, Inc., 191 F.3d 777, 782 (7th Cir. 1999); Gilmore v. Southwestern Bell Mobile Systems, L.L.C., 2001 WL 1539157 *10 (N.D. Ill. Nov. 30, 2001); Hirata Corp. v. J.B. Oxford & Co., 193 F.R.D. 589, 592 (S.D. Ind. 2000).  Fair notice is the most basic consideration. Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 777-78 (7th Cir. 1994); Winthrop Resources Corp. v. Lacrad International Corp., 2002 WL 24248 *3 (N.D. Ill. Jan. 7, 2002); Gilmore, 2001 WL 1539157 at *10.

The allegations identify "Maynard, acting in collusion with Bedard and Boivin" as the individual persons who engaged in the fraudulent conduct.  Complaint ¶ 20.  The complaint also

identifies the individuals' positions at the companies. Id. ¶¶ 11-12. The misrepresentations are identified as the overreporting of fiscal year 1996 and 1997 net sales figures. Id. ¶ 22. The fraudulent acts are further identified as "Creating and recording fictitious invoices on the books of the SportRack Division; Recording sales to fictitious customers; Churning of invoices, i.e., generating sales invoices that were subsequently reversed through credit memos; Intentionally failing to issue credits for returned inventory; Pre-booking of invoices at the time of ordering for merchandise which was never shipped; Recording sales at the time of ordering and again at the time of shipment; Recording non-revenue transfers as sales, such as transfers of merchandise to company warehouses; [and] Changing due dates on invoices to misrepresent true aging of accounts receivable." Id. ¶ 21.

Thus, the time, place, content, and method of misrepresentation are identified. The fraudulent actors are also sufficiently identified. It is not necessary to specifically identify which of the particular defendants was directly responsible for each act of fraud; identification of their positions within the organization is sufficient at this point in the litigation. See Bell Enterprises Venture v. Santanna Natural Gas Corp., 2001 WL 1609417 *6 (N.D. Ill. Dec. 12, 2001); Petri v. Gatlin, 997 F. Supp. 956, 974-75 (N.D. Ill. 1997); Alumax Mill

Products, Inc. v. Krzysztofiak, 1997 WL 201555 *3 (N.D. Ill. April 17, 1997); ESI Montgomery County, Inc. v. Montgomery International Corp., 1996 WL 22979 *3 (S.D.N.Y. Jan. 23, 1996). The complaint provides sufficient notice to prepare a defense. Count I will not be dismissed.[10]

IT IS THEREFORE ORDERED that defendants' motion to dismiss [3-1] is denied. Defendants shall answer the complaint within two weeks. All discovery, including any expert discovery, is to be completed by June 3, 2002. Status hearing set for March 20, 2002 at 11:00 a.m. at which the parties shall submit a discovery scheduling plan listing name, date, time, and place for all remaining depositions.

ENTER:

/s/ William T. Hart
UNITED STATES DISTRICT JUDGE

DATED: FEBRUARY 20, 2002

---

[10]In its answer brief, plaintiff represents that it intends to amend the complaint to add a rescission count. If it still has such intentions, plaintiff should promptly amend the complaint so as to avoid defendants having to answer both the original and amended complaint. If plaintiff amends before defendants answer the original complaint, no leave to amend is required and defendants will have 10 days thereafter to answer the amended complaint. See Fed. R. Civ. P. 15(a).